W. Bladen **LOWNDES** and Anne W.
Lowndes, Appellants,

v.

**UNITED STATES** of America,
Appellee.

No. 11193.

United States Court of Appeals
Fourth Circuit.

Argued May 3, 1967.

Decided Oct. 13, 1967.

P. McEvoy Cromwell, Baltimore, Md.
(John D. Wright, Baltimore, Md., on the
brief), for appellants.

William Friedlander, Atty., Dept. of
Justice, (Mitchell Rogovin, Asst. Atty.
Gen., Lee A. Jackson and Gilbert E.
Andrews, Attys., Dept. of Justice, and
Thomas J. Kenney, U. S. Atty., and
Ronald T. Osborn, Asst. U. S. Atty., on
the brief), for appellee.

Before SOBELOFF, BOREMAN and
BRYAN, Circuit Judges.

**SOBELOFF, Circuit Judge:**

■ The question presented by this appeal is whether the taxpayer realized ordinary income when she purchased all of the outstanding stock of each of four corporations or whether she received income, taxable either as long term capital gain or as ordinary income, at the time of liquidation, more than six months after the acquisition of the stock of each corporation. The stock purchases were made in Mrs. Lowndes' name only, but the tax returns for 1957, 1959 and 1960, the years in question, were filed jointly by Mr. Lowndes and his wife.

The four corporations, subsidiaries of three subsidiaries of Bethlehem Steel Company, all had ceased operating in the early fifties, and their only remaining assets were cash on deposit in banks. Each company had sustained losses, but Bethlehem could not avail itself of them for tax purposes if it liquidated the corporations and distributed the assets to itself. Int.Rev.Code of 1954, § 332. In order to achieve the benefit of a tax loss deduction, therefore, Bethlehem negotiated the sale of the stock of each of the corporations to the taxpayer. It required, as a condition of the sale, that the purchase price be paid it in cash. It is undisputed that the taxpayer had no past relationship with Bethlehem or its subsidiaries, and that the sale of the stock was an arm's length transaction.

To purchase the corporations, Mr. Lowndes, a semi-retired banker, arranged for his wife to borrow the necessary cash from the Union Trust Company of Maryland on 4½% and 5% demand notes secured by pledging the corporate shares. According to Mr. Lowndes, who submitted his testimony by deposition, Union Trust agreed to make the loans only if the corporate bank accounts were placed in Union Trust and converted to time deposit accounts, bearing interest of 2½% and 3%, for a six month period.[1]

A little more than six months after the purchase of the corporations, each was liquidated, the assets distributed to Mrs. Lowndes, and the loans from Union Trust repaid out of the corporate funds, proceeds of the liquidation. In the returns, the proceeds were treated as long term capital gains realized upon liquidation. The Commissioner, however, determined that ordinary income, to the extent that the cash value of the stock exceeded the purchase price, was realized at the time of aquisition of the stock. Alternatively, the Commissioner determined, the taxpayer realized ordinary income at liquidation. Accordingly, additional income taxes were assessed. The taxpayers paid under protest and sued in the District Court for refund.[2]

The taxpayers argued in the court below that the existence of the corporate entities served to protect Mrs. Lowndes from tax liability until the dates of their liquidation. Their contention was that the determinative factor of when income is realized is solely the objective date of liquidation and that the taxpayer's

---

1. Understandably, the District Judge found it "difficult to believe that Union Trust would insist that cash in its bank be retained on an interest bearing basis where retention of the cash would cost Union Trust an interest expense." 258 F.Supp. 193, 199 (D.Md. Nov. 4, 1966). The Judge was of the view that it was more likely that the bank accounts were converted to time deposits at Mr. Lowndes' instance, solely in the expectation that, by postponing liquidation for six months, the realization of gain would be delayed long enough to make it eligible for capital gains treatment. Mr. Lowndes admitted that this was "one of the reasons" why the corporations were not liquidated at the time of their purchase from Bethlehem. He further testified that he had no intention of reactivating the corporations, which at one time had been engaged in coal mining and in the manufacture of pumps.

2. The taxpayers were assessed $8,195.20 for 1957 and $14,256.25 for 1959, on the theory that Mrs. Lowndes realized ordinary gain on the dates she acquired the stock of two of the four corporations ultimately purchased. An assessment of $6,927.71 was made for the year 1960 on the alternative theory that Mrs. Lowndes realized ordinary income in the year the two corporations whose stock she purchased in 1959 were liquidated.

motives for delaying liquidation are irrelevant, citing Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).[3] They further asserted, however, that even were the corporate entities to be disregarded, Mrs. Lowndes realized long term capital gain—either because the corporate funds were converted to time deposits and were not subject to her "unfettered" control until the expiration of the statutory six month period, or because the corporate bank accounts "purchased" by the taxpayer are capital assets. The District Court considered that if the corporate entities were disregarded, what the taxpayer did was, in effect, to purchase cash. It was only because she did have complete control over the cash accounts, the Judge reasoned, that she was able to set up the financing arrangement that permitted her to make the purchase. In his view, therefore, the principal question for decision was whether the corporate entities should be ignored. The appellants contend in this court, as they did in the District Court, that Moline Properties, Inc. v. Comm'r of Internal Revenue, 319 U.S. 436, 438–439, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943) and subsequent cases compel the conclusion that since the corporations in question in-

vested their funds in interest-bearing time deposit accounts, even though the sole *purpose* of such investment was to enable Mrs. Lowndes to maintain her financing arrangement, this production of interest was sufficient "business activity" to prohibit disregard of the corporate entities.[4] The District Court found, to the contrary, that investment of the corporate funds in interest-bearing time deposit certificates was not a "business purpose," but "was a condition precedent to the making of a loan for the accommodation of Mrs. Lowndes."

Concluding that in substance the transactions were "nothing more than the immediate purchase of cash at a discount," in the form of liquid bank accounts, 258 F.Supp. 193, 200 (D.Md. 1966), the District Court felt warranted in disregarding the "mere formalisms."[5] Finding that the taxpayer had the right to exercise dominion over the corporate bank accounts at the time of the transactions with Bethlehem,[6] the District Court held that income was realized on the dates of the stock purchases and should be taxed as ordinary income. The sole reason attributable to the six months' delay in *physically* obtaining the "fruits of the purchases," the District

3. "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether to avoid them, by means which the law permits, cannot be doubted. * * * But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."
293 U.S. at 469, 55 S.Ct. at 267.

4. Moline Properties, Inc. v. Comm'r of Int. Rev., 319 U.S. 436, 438–439, 63 S.Ct. 1132 (1943) held that a corporate entity should be recognized for tax purposes so long as the purpose of its being "is the equivalent of business activity or is followed by the carrying on of business by the corporation."

5. Citing Comm'r of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945): "To permit the true nature of a transaction to be disguised by mere formal-

isms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."

6. It was conceded that Bethlehem imposed no conditions on the taxpayer's post-purchase use of the corporate assets. As the government points out, any restrictions which arose subsequent to the sale were created by the taxpayer, and could come into being only because of her complete control of the assets. As further evidence of the taxpayer's dominion over the corporate bank accounts purchased by her, the government notes, using one of the corporations, American Well, as an example, that the secured loan was for only $93,000, while the corporate funds amount to $100,000. Thus the taxpayer could have withdrawn the $7,000 excess at any time despite the fact that the remaining $93,000, under the terms of the financing arrangement, had been converted to a time deposit account.

Court found, was to utilize the long term capital gains provision of the tax laws.

■ We find ourselves in accord with the District Court's holding that in the existing circumstances the corporate entities should be disregarded.

■ There is an alternative theory which leads to the same result. The true nature of the transactions under review was that of a bargain purchase. Bethlehem sought a purchaser to establish its tax benefit. The taxpayer was willing to assist Bethlehem in effecting an arrangement advantageous to it in return for a fee, though not so denominated. Under such circumstances, a "bargain purchase" is taxable as immediate income.

Taking the sale of the stock of one of the subsidiaries as typical of all four transactions, the taxpayer was permitted to purchase and did purchase from Bethlehem all of the stock of American Well & Prospecting Company, unquestionably worth $100,000—the sole asset being a $100,000 non-interest bearing bank account—for $93,000. The taxpayer thus realized an immediate profit of $7,000, the difference between the bargained-for value and its incontestably true value. From the circumstances shown, the conclusion is inescapable that the $7,000 profit was nothing other than compensation for the taxpayer's service to Bethlehem. Although the sale was bona fide, the result was a fee realized at the time of the transaction even though not reduced to cash until a later date. It was not a purchase by the taxpayer for investment purposes. Such compensation is not gain from the sale or exchange of a "capital asset" and consequently, must be denied capital gains treatment.

In Comm'r of Internal Revenue v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956), the taxpayer's employer gave him a nontransferable stock option at less than the market value of the stock. Treating the difference between option price and market value as a form of compensation for services, the Supreme Court held that when he exercised the option the taxpayer "realized" income which was taxable immediately, rather than when he later sold the stock.[7] Similarly, the gains in the present case are in truth compensation, resulting in the immediate realization of taxable income. We have here no purchase for investment purposes of property which may appreciate in value. There is no suggestion of negotiations concerning the value of property consisting solely of a liquid bank account. If there was any bargaining at all, it was over the amount of the differential between the purchase price and the corporate bank account.

The taxpayer maintains that her case comes within the rule of Palmer v. Comm'r of Internal Revenue, 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50 (1937), that profits derived from the purchase of property do not accrue to the taxpayer until its eventual sale or other disposition, the taxable income being the difference between the amount thus realized and its cost. In Palmer, the company had issued to its stockholders rights to purchase, at its then fair market value, shares acquired from another company. The Court stated that

> "the bare fact that a transaction, on its face a sale, has resulted in a distribution of some of the corporate assets to stockholders, gives rise to no inference that the distribution is a dividend within the meaning of § 115 [now § 301]."

302 U.S. at 69–70, 58 S.Ct. at 70. The Court, however, made a qualifying observation highly significant for us—namely that the situation might be dif-

---

7. See also United States v. Midland-Ross Corp., 381 U.S. 54, 85 S.Ct. 1308, 14 L.Ed.2d 214 (1965). This case held that gains realized from the sale of noninterest-bearing promissory notes bought by the taxpayer at a discount prior to maturity were taxable as ordinary income and not as capital gains, since "earned original issue discount * * * is simply 'compensation for the use or forbearance of money.'" Id. at 57, 85 S.Ct. at 1310.

ferent if it were shown that the sale was for substantially less than the fair market value of the property sold, tending to indicate that the transaction *was* being used to distribute corporate earnings to its stockholders. Citation to *Palmer* is plainly inapposite in the present circumstances, where the profit was predetermined and specifically bargained for in exchange for assisting Bethlehem in a transaction which would result in the recognition of that company's loss. In contrast, the profit held not to be taxable gain in *Palmer* resulted from appreciation in the market value of the property between the time the privilege of purchasing the stock was extended by the corporation and the time the privilege was exercised by the shareholder.

■ To qualify for capital gains treatment, it is not enough that income be realized through a sale or exchange of property.[8] United States v. Midland-Ross Corp., 381 U.S. 54, 85 S.Ct. 1308 (1965); Comm'r of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1961); Corn Products Co. v. Comm'r of Int. Rev., 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955); Comm'r of Int. Rev. v. Phillips, 275 F.2d 33 (4th Cir. 1960). Many of the Supreme Court cases which have held that certain "property" is not a capital asset have stressed the absence of speculation and risk.[9] Quite evidently, in the present case there was no risk, since the only asset of the non-operating corporation was cash in the form of a liquid bank account. The $7,000 profit from the purchase of American Well stock (the same holds true for the other corporations purchased by the taxpayer from Bethlehem) sprang immediately from the deliberately prearranged agreement between the taxpayer and Bethlehem.

The compensation for services rendered was immediately reportable as ordinary gain. The subsequent liquidation of the corporations, whether effected in the year of purchase, the next year, or any other time, is entirely immaterial in determining either the character of the gain or the date of its realization.[10] The judgment of the District Court is

Affirmed.

8. "[N]ot everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term 'capital asset' is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year."
United States v. Midland-Ross Corp., 381 U.S. 54, 56–57, 85 S.Ct. at 1310 (1965), quoting from Comm'r of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S.Ct. 1497 (1961).

9. See, e. g., United States v. Midland-Ross Corp., supra at 57, 85 S.Ct. at 1310 ("Unlike the typical case of capital apprecia-
tion, the earning of discount to maturity is predictable and measurable * * *."); Corn Products Co., supra at 51, 76 S.Ct. at 23 (Entry into the corn futures market "was not for the purpose of 'speculating and buying and selling corn futures.'"); Comm'r of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 265, 78 S.Ct. 691, 694, 2 L.Ed.2d 743 (1958) ("The pay-out of these particular assigned oil payment rights could be ascertained with reasonable accuracy.").

10. Because of the Commissioner's alternative assessments, note 2 supra, the taxpayers were entitled to a refund. The District Court having held that gain was realized immediately upon purchase of the corporate stock, and thus was reportable in the years of purchase rather than the years in which the corporations were liquidated, properly allowed the taxpayers a refund of $11,272.38 plus interest.